**UNITED STATES of America**

v.

**IRA S. BUSHEY & SONS, INC., TANKER HYGRADE NO. 8 INC., et al.**

**Civ. A. No. 6380.**

United States District Court,
D. Vermont.
July 27, 1972.

George W. F. Cook, U. S. Atty., and David A. Gibson, Asst. U. S. Atty., Rutland, Vt., for plaintiff.

John D. Carbine and John J. Zawistoski, Ryan, Smith & Carbine, Rutland, Vt., and Christopher E. Heckman, McHugh, Heckman, Smith & Leonard, New York City, for defendants Ira S. Bushey & Sons, Inc., Spentonbush Transport Service, Inc., and Tanker Hygrade No. 8 Inc.

Donald E. O'Brien, Burlington, Vt., for defendants Northern Oil Co., Inc., and Northern Terminals, Inc.

## OPINION AND ORDER

OAKES, Circuit Judge.

The Government's complaint alleges that the corporate defendants have violated the Refuse Act, 33 U.S.C. § 407, in seven instances since 1967. These violations are said to have occurred in the course of defendants' business of transporting petroleum products across Lake Champlain to Vermont waters and shores.[1] The action is civil in nature,

---

1. Defendant Ira S. Bushey & Sons, Inc., is a New York corporation which wholly-owns subsidiary corporations, which own vessels used to transport liquid cargoes (Tanker Hygrade No. 8 Inc.; Tug Carmelite Corporation) and which solicit orders for and arrange for the performance of water transportation of those cargoes (Spentonbush Transport Service, Inc.). Northern Oil Company, Inc., is a Vermont corporation and parent to Northern Terminals, Inc., which operates a dolphin used for unloading petroleum products and located in Burlington harbor.

The Government alleges the following as violations of 33 U.S.C. § 407:

a. On or about April 30, 1967, tank barge Hygrade #30, owned by Tanker Hygrade #30, Inc., a wholly-owned subsidiary of Bushey, delivered a cargo of jet fuel to Northern Oil at the Northern Terminal dolphin in Burlington harbor; approximately 14,500 gallons leaked into Lake Champlain from the pipe line

the relief requested a permanent injunction requiring defendants to observe connecting the Hygrade #30 with the dolphin and shore storage tanks.

b. August 27, 1967, tank barge Hygrade #28, owned by Tanker Hygrade #28, Inc., a wholly-owned subsidiary of Bushey, ran aground at Proctor Shoal as it was approaching Shelburne Harbor, Vermont; approximately 1,600 gallons of high-test gasoline was spilled into Vermont waters of Lake Champlain.

c. On or about June 26, 1969, tank barge Hygrade #30, owned by Tanker Hygrade #30, Inc., delivered a cargo of jet fuel to Northern Oil at the Northern Terminal dolphin in Burlington harbor; caps were not placed on the ends of the pipe lines at said dolphin, resulting in spillage of jet fuel into Vermont waters of Lake Champlain.

d. On October 5, 1969, tank barge Hygrade #26, owned by Tanker Hygrade #26, Inc., a wholly-owned subsidiary of Bushey, under the towage of the tug Chaplain [sic], owned by New York Scow Corporation, a wholly-owned subsidiary of Bushey, ran aground at Proctor Shoal as it was approaching Shelburne Harbor, Vermont; after the Hygrade #26 was freed and towed to Shelburne Harbor, approximately 25,000 gallons of gasoline leaked from the barge during its unloading at the American Oil terminal, spilling into Vermont waters of Lake Champlain.

e. On August 15, 1970, tank barge Blue Line #108, owned by Tanker Hygrade #4, Inc., a wholly-owned subsidiary of Bushey, was delivering a cargo of petroleum product to Gulf Oil terminal in Burlington harbor, Vermont; during unloading operations a hose on the Blue Line #108 ruptured resulting in the spillage of approximately 7,000 gallons of petroleum product into Vermont waters of Lake Champlain.

f. On or about May 21, 1971, tank barge Hygrade #26, owned by Tanker Hygrade #26, Inc., was delivering a cargo of petroleum product to Shell Oil terminal in Burlington harbor, Vermont; approximately 20 gallons of petroleum product spilled from the barge into Vermont waters of Lake Champlain as a result of a crack in its hull.

g. On or about June 1, 1971, approximately 3,000–5,000 gallons of petroleum product spilled from tank barge Hygrade #8 into Vermont waters of Lake Champlain at Burlington harbor, as alleged above . . . .

specified safety regulations.[2] The aim of the Government as plaintiff is to force

2. The Government proposes to amend its prayer for relief against defendant Bushey and its corporate children as follows, in pertinent part:

A. This Court permanently enjoin Bushey, Spentonbush, Tanker and Carmelite so as to require Bushey, Spentonbush, Tanker and Carmelite to have all vessels and personnel belonging to, employed by, and used by them, and/or by all persons and corporations owned, under contract and/or controlled by said Bushey, Spentonbush, Tanker and Carmelite comply with the following so as to reduce the risk of oil spills in Vermont waters of Lake Champlain:

(1) a. All vessels moored with cargoes of oil must display lights visible to other users of Lake Champlain during darkness;

b. No vessels may be moored with cargoes of oil on Lake Champlain during darkness without displaying lights visible to other users of the Lake;

(2) a. All tugboats must have pilots having pilots' licenses issued by the United States Coast Guard;

b. No tugboats may be operated except by pilots having pilots' licenses issued by the United States Coast Guard;

(3) a. All tugboats must have engineers having engineers' licenses issued by the United States Coast Guard;

b. No tugboats may be operated except with engineers having engineers' licenses issued by the United States Coast Guard;

(4) a. All tugboat engineers must annually have general physical examinations, with particular certification that their hearing is unimpaired or is correctible by use of hearing aids;

b. No tugboat engineers may act as such unless they have annual general physical examinations, certifying that their hearing is unimpaired or is correctible by use of hearing aids;

(5) a. All tugboats must have operational searchlights at all times;

b. No tugboats may be operated unless their searchlights are operational at all times;

(6) a. All tugboats must have radar in operation at all times during periods of darkness or reduced visibility;

b. No tugboats may be operated unless their radar is in operation at all times during periods of darkness or reduced visibility;

(7) All tugboat crew members must not report to duty under the influence

defendants to conduct their operations in such a way that the risk of oil spills and seepages into Lake Champlain will be reduced. Jurisdiction is based upon 28 U.S.C. § 1345.

Defendants have moved for dismissal on the ground that the complaint does not state facts upon which relief may be granted. Defendants first contend that the Rivers and Harbors Act, even as broadly construed, precludes enforcement of section 407 of Title 33 by injunction absent a continuous statutory violation, *see* United States v. Republic Steel Corp., 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960), or unless the requested order would direct defendant to remedy a prior violation. *See* Wyandotte Transportation Co. v. United States, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967). Defendants further argue that the relief sought is not obtainable because it would involve an unconstitutional judicial usurpation of the legislative power of Congress and would require the court "to act in a discriminatory manner" by establishing regulations that would not apply to all users of Lake Champlain or all users of the navigable waters of the United States. Third and finally, defendants argue that injunctive relief is unavailable because plaintiff has adequate remedies at law under 33 U.S.C. § 411, which

provides for fines for violations of section 407, and under other statutes as well as the rule-making procedures of administrative agencies charged with oil spill control.

■ On a motion to dismiss, it is elementary that the complaint is construed in the light most favorable to plaintiff and its allegations of fact are taken as true. Boddie v. Connnecticut, 401 U.S. 371, 373, 91 S.Ct. 780, 28 L.Ed. 2d 113 (1971); Build of Buffalo, Inc. v. Sedita, 441 F.2d 284, 287–288 (2d Cir. 1971). Moreover, in furtherance of the explicit policies of the Federal Rules of Civil Procedure to secure prompt and substantial justice, Fed.R.Civ.P. 1, 8(f), "a complaint should not be dismissed for legal insufficiency except where there is a failure to state a claim on which *some* relief, not limited by the request in the complaint, can be granted." Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920, 925–926 (2d Cir. 1968), and see authorities there cited.

■ As will be pointed out below, plaintiff's complaint clearly states a claim, under the federal common law of nuisance, upon which relief may be granted. Accordingly, while the *Wyandotte Transportation* and *Republic Steel* cases, *supra,* other federal court decisions [3] and the general principles of equity jurisprudence [4] suggest that the

---

of alcohol and/or drugs, and must not consume alcoholic beverages within a period of four hours prior to reporting for duty;

(8) a. All tugboats must have engine controls located in their pilot houses;

b. No tugboats may be operated unless their engine controls are located in their pilot houses;

(9) a. All vessels must travel at reasonable speeds and at all times under the speed of five (5) miles per hour within Burlington and Shelburne harbors;

b. No vessels may travel at other than reasonable speeds and in no event at speeds in excess of five (5) miles per hour within Burlington and Shelburne harbors.

    *      *      *      *      *

D. Each defendant must adopt, subject to the approval of the Environ-

mental Protection Agency, contingency plans relating to the prevention of and clean-up of discharges of oil and hazardous substances into Vermont waters of Lake Champlain.

E. This Court issue any further relief it deems necessary and proper.

3. *See, e. g.,* Connecticut Action Now, Inc. v. Roberts Plating Co., 457 F.2d 81 (2d Cir. 1972) (dictum); United States v. Armco Steel Corp., 333 F.Supp. 1073 (S.D.Tex.1971); United States v. Florida Power & Light Co., 311 F.Supp. 1391 (S.D.Fla.1970); United States v. Oceana Terminal Corp., Civ. No. 70–1172 (S.D. N.Y., Apr. 23, 1970).

4. *See, e. g.,* Porter v. Warner Holding Co., 328 U.S. 395, 397–398, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946); H. McClintock, Equity § 15, at 32–33 (1948).

facts as stated here would support injunctive relief as proper enforcement of the Refuse Act, this issue need not now be decided.

In Illinois v. City of Milwaukee, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972), Illinois sought to invoke the original jurisdiction of the United States Supreme Court in a suit against four Wisconsin cities and the sewerage commissions of the City and County of Milwaukee. The cause of action was public nuisance, based on the defendants' alleged pollution of Lake Michigan. Remitting the parties to the appropriate federal district court, the Court held that 28 U.S.C. § 1331 jurisdiction "will support claims founded upon federal common law as well as those of a statutory origin." 406 U.S. at 100, 92 S.Ct. at 1391.[5] In doing so the Supreme Court significantly has revitalized "poor old nuisance"[6] as a legal theory useful in the resolution of pollution conflicts involving interstate or navigable waters.

What is important about Illinois v. City of Milwaukee for the purposes of the instant case, however, is the declaration there that the numerous laws Congress has enacted to prohibit or control pollution of interstate or navigable waters do not establish in themselves the exclusive means by which the federal policy concerning, and interest in, the quality of waters under federal jurisdiction may be protected in the federal courts. In the *Illinois* case, as here,

[t]he remedy sought by [plaintiff] is not within the precise scope of remedies prescribed by Congress. Yet the remedies which Congress provides are not necessarily the only federal remedies available. "It is not uncommon for federal courts to fashion federal law where federal rights are concerned." Textile Workers v. Lincoln Mills, 353 U.S. 448, 457, 77 S.Ct. 923, 1 L.Ed.2d 972.

406 U.S. at 103, 92 S.Ct. at 1392. And, in setting forth directives to the lower courts on the handling of common law pollution actions, Mr. Justice Douglas wrote, for the unanimous Court:

It may happen that new federal laws and new federal regulations may in time pre-empt the field of federal common law of nuisance. But until that comes to pass, federal courts will be empowered to appraise the equities of the suits alleging creation of a public nuisance by water pollution. . . There are no fixed rules that govern; these will be equity suits in which the informed judgment of the chancellor will largely govern.

406 U.S. at 107–08, 92 S.Ct. at 1395.

■ The national interest in the quality of air and water in their ambient or interstate aspects has been manifested in executive statements,[7] congressional legislation,[8] and administrative agency regulation.[9] It is settled that the Attorney General by virtue of his office may sue to protect that federal interest.

---

5. The federal question jurisdictional theory adopted by the Court was forseen and analyzed, prior to the decision, in Woods & Reed, The Supreme Court and Interstate Environmental Quality, 12 Ariz.L. Rev. 691 (1970).

6. "Poor old nuisance has been the common law's meager response to the crowdedness of society. The doctrine is pathetically inadequate to deal with the social realities of this half-century . . . ." Wright, The Federal Courts and the Nature and Quality of State Law, 13 Wayne L.Rev. 317, 331 (1967).

   That the federal common law may not be so useful a vehicle in the development of environmental principles is argued in

Note, Federal Common Law and Interstate Pollution, 85 Harv.L.Rev. 1439, 1451–56 (1972).

7. *See, e. g.,* President's Message on Environmental Protection, Feb. 8, 1972, in 2 U.S.Code Cong. & Ad.News 605 (Mar. 25, 1972) ; President's Message on the State of the Nation's Environment, Feb. 8, 1971, in 1 U.S.Code Cong. & Ad.News 51 (Feb. 25, 1971).

8. *See, e. g.,* National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq.; Federal Water Pollution Control Act, 33 U.S.C. § 1151 et seq.

9. *See, e. g.,* the Rules and Regulations of the Corps of Engineers governing per-

28 U.S.C. §§ 516–519; *see* Wyandotte Transportation Co. v. United States, *supra*, 389 U.S. at 201, 88 S.Ct. 379. Now *Illinois v. City of Milwaukee* makes it clear that "application of federal common law to abate a public nuisance in interstate or navigable waters is not inconsistent with the Water Pollution Control Act," 406 U.S. at 104, 92 S.Ct. at 1393, the Rivers and Harbors Act of 1899, or any other legislation yet enacted. The Justice Department has hailed this development as establishing a "new and important legal remedy," Environment Reporter, Current Developments, May 26, 1972, at 96, and in at least one pollution action, in which remedial attempts pursuant to the Federal Water Pollution Control Act have proved futile for nearly three years, has amended its complaint to include an allegation of public nuisance. United States v. Reserve Mining Co., Civ. Docket No. 5–72–19 (D.Minn., complaint amended May 4, 1972).

■■■ Thus defendants' first two arguments on their motion to dismiss fail, for the Rivers and Harbors Act does not foreclose a public nuisance action, and any framing of equitable relief against the defendant in an otherwise constitutionally permissible case or controversy clearly does not amount to usurpation of the legislative power or improper "discrimination" against the losing party.

Defendants' third argument as presented is, on close examination, a hybrid of their first, *viz.*, that extant laws and regulations preempt injunctive relief because they provide the supposedly exclusive congressionally-enunciated remedies at law, and of the contention that such congressional provisions constitute "adequate" remedies in terms of equity ju-

risprudence. The exclusivity argument falls for the reasons stated above; the adequacy argument is unavailing, at least on this motion, for the following reasons.

■■■ First, taken as true, the Government's complaint establishes that defendants' conduct has interfered with a right or rights common to the general public [10]—substantial rights to the use and enjoyment of water not polluted by petroleum, to which rights Vermonters and their out-of-state guests and visitors are privy—which interference if unreasonable constitutes a public nuisance. *See* Restatement (Second) of Torts § 821B (Tent. Draft No. 17, 1971). But it is the duty of the trier of fact in nuisance actions to determine the reasonableness of the conduct, and hence the existence of the nuisance, and that must be done at trial. Whether there be adequate remedies at law precluding injunctive relief, therefore, is a question which necessarily must be reached only after the merits of the case are heard.

■ Second, defendants' adequacy argument is not bolstered because the relief sought is concerned with preventing noncontinuous, future injury, which Congress and administrative agencies may and here do have jurisdiction to control. "One distinguishing feature of equitable relief is that it may be granted upon the threat of harm which has not yet occurred," W. Prosser, Handbook of the Law of Torts 624 (3rd ed. 1964), and where nuisance conduct by its very nature and history is indicative of a tendency to reoccur, the contingency of third party remedial action will not foreclose a properly instituted nuisance suit.

And, lest it be thought that a federal district court's stepping, in the exercise of its equitable jurisdiction, into the

mits for discharges and deposits into navigable waters. 36 Fed.Reg. 6564 et seq.

10. Lake Champlain is public, navigable water. *See* State v. Cain, 126 Vt. 463, 236 A.2d 501 (1967). Pursuant to the Federal Water Pollution Control Act, 33

U.S.C. § 1160(c) (1), (3), water quality standards have been established for it. Within the borders of Vermont the lake is Class B water, with public rights thereto in categories such as bathing and other recreational uses, fishing, agricultural uses, industrial uses and water supply uses.

area of rules of navigation on an inland lake is in water over its head in which the court is incapable of remaining afloat, it is well to recall the classic statement of Mr. Justice Douglas in Hecht Co. v. Bowles, 321 U.S. 321, 329–330, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944):

> The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims.

Motion to dismiss denied.