**UNITED STATES of America**

v.

**SOLVENTS RECOVERY SERVICE OF NEW ENGLAND and Lori Engineering Company.**

**Civ. A. No. H 79–704.**

United States District Court,
D. Connecticut.

Aug. 20, 1980.

Frank H. Santoro, Asst. U.S. Atty., Richard Blumenthal, U.S. Atty. for the District of Connecticut, New Haven, Conn., Erica L. Dolgin, Atty., Hazardous Waste Section, Land and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff.

Michael L. Rodburg, Gerald Krovatin, Lowenstein, Sandler, Brochin, Kohl, Fisher & Boylan, Roseland, N.J., Robert L. Wyld, Thomas D. Clifford, Shipman & Goodwin, Hartford, Conn., Robert H. Hall, Newtown, Conn., for defendant Solvents Recovery Service of New England.

Rolland Castleman, Stanley Falkenstein, Lessner, Rottner, Karp & Plepner, P. C., Manchester, Conn., for defendant Lori Engineering Co.

Austin Carey, Jr., Hoppin, Carey & Powell, Hartford, Conn., Peter Cooper, Sosnoff, Cooper, Whitney & Cochran, New Haven,

Conn., Daniel Millstone, Connecticut Fund for the Environment, Inc., New Haven, Conn., for *amici curiae* and applicants for intervention Connecticut Fund for the Environment, Inc., Southington Citizens Action Group, Edward Avery, Joan Bradley, Edwina Ludecke and Gladys Langton.

David P. Kelley, Thalberg & Kelley, Southington, Conn., for *amicus curiae* and applicant for Intervention Board of Water Commissioners for the Town of Southington.

MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS TO DISMISS CLAIM ONE OF THE COMPLAINT OR TO STRIKE PRAYERS OF RELIEF FROM THE COMPLAINT

JOSÉ A. CABRANES, District Judge:

*Introduction*

The United States brings this action, pursuant to section 7003 of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6973, for injunctive relief to abate and remedy allegedly unlawful groundwater pollution in Southington, Connecticut. In Claim One of the complaint, the plaintiff alleges that the defendants, Solvents Recovery Service of New England ("Solvents Recovery") and Lori Engineering Company ("Lori"), are responsible for the seepage of highly toxic chlorinated hydrocarbons into underground wells which have until recently been used to supply drinking water to residents of the Town of Southington.[1] The United States seeks an order requiring the defendants to undertake a number of remedial measures to clean up this groundwater pollution and provide safe drinking water for Southington residents.

The defendants have moved, pursuant to Rule 12(b)(6), Fed.R.Civ.P., to dismiss Claim One for failure to state a claim upon which relief can be granted. In the alternative, they seek an order striking certain paragraphs of the Prayer for Relief in the plaintiff's complaint, *see* Rule 12(f), Fed.R. Civ.P., on the ground that the relief requested therein is unauthorized by section 7003 of RCRA.

These motions present novel questions concerning the proper scope of section 7003 and the nature of the rights and remedies which are sanctioned by that statute. Upon consideration of the statutory language, the legislative history and purpose of section 7003 and RCRA generally, and the evolving federal common law of nuisance in pollution cases, the court concludes, for the reasons stated at length below, that: the federal common law of nuisance governs an action brought under section 7003; that body of common law, as applied to an incident of groundwater pollution, does not require an allegation of interstate effects (such as pollution originating in one state migrating to another); the government need not allege that the acts of "disposal" which gave rise to the imminently hazardous condition at issue in a section 7003 case continued up to the date of the filing of the complaint; and the application of the federal common law of nuisance in a section 7003 case is not impermissibly retroactive even though some of the acts which caused the hazardous condition antedated the enactment of RCRA.

Accordingly, the court holds that Claim One states a cause of action for injunctive relief under section 7003 and denies the motions to dismiss. Moreover, although it would be premature to rule on the nature of the relief, if any, which the United States might ultimately establish to be appropriate, the court cannot now determine that any of the relief sought by the plaintiff is, as a matter of law, outside the scope of the remedies authorized by section 7003. Therefore, the defendants' alternative motions to strike certain paragraphs of the Prayer for Relief are denied.

---

1. In Claim Two of the Complaint, the United States alleges that Solvents Recovery has violated section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), by discharging chemical wastes into a tributary of the Quinnipiac River without the National Pollutant Discharge Elimination System permit required by section 402 of that statute, 33 U.S.C. § 1342. The pending motions do not address this claim, and the court has no occasion to consider the issues raised by the allegations of the United States under the Clean Water Act.

## I. THE MOTIONS TO DISMISS

### A. Factual Allegations

On a motion to dismiss, the starting point for the court's analysis must be the allegations of the complaint, which are to be taken as true and viewed in the light most favorable to the plaintiff.[2] Only if "it appears beyond doubt that the plaintiff can prove no set of facts . . . which would entitle [it] to relief"[3] may the court dismiss Claim One. The pertinent allegations of the complaint are summarized below.

The business of defendant Solvents Recovery, which is located in Southington, is the distribution, recovery and disposal of industrial solvents. Since it commenced operations in 1955, Solvents Recovery has accepted waste products (including chlorinated organic solvents) from industries in New England, processed those materials in order to recover usable chemicals, and returned the recovered chemicals to industry for reuse.

Among the chlorinated hydrocarbons which Solvents Recovery receives, processes and distributes are tetrachloroethylene, chloroform, trichloroethylene, 1,1,1 trichloroethane, dichloroethane and carbon tetrachloride. All of these chemicals are either known or suspected to be carcinogenic. In addition, exposure to some or all of these chemicals has caused serious illnesses or disorders in human beings. For example, trichloroethylene may cause cell mutations, damage the nervous system and induce liver disorders. The nervous, pulmonary and cardiovascular systems, as well as the liver and kidneys, may be injured by exposure to 1,1,1 trichloroethane. Similar toxic effects have been ascribed to the other organic chemicals listed above.

The operations of Solvents Recovery produce distilled and undistilled waste materials. Since its founding, Solvents Recovery has temporarily stored such materials — including the chemicals referred to in the previous paragraph — in drums on its property; until 1979, these drums were simply placed on the ground on Solvents Recovery's premises. As a result of Solvents Recovery's method of operating and maintaining its plant, substantial amounts of these chemical wastes leaked and spilled from the drums onto and into the ground on its property.

Moreover, Solvents Recovery has directly disposed of millions of gallons of chemical wastes, which are the residues of its recovery and distillation processes, into the ground at its Southington property. During the period 1957–67, it dumped these wastes into "unlined lagoons" on its plant site. Although these "lagoons" were drained and covered in 1967, a significant amount of waste material had already entered the earth by that time; it remained in the ground thereafter.

The chemical wastes which entered the soil on the Solvents Recovery site have "percolated" downward into the underlying groundwater and migrated generally in a southeasterly direction. The migration of these toxic organic wastes has reached the aquifer — i.e., the subterranean stratum which is saturated with groundwater[4]— in which Well No. 6 of the Board of Water Commissioners for the Town of Southington is located. This well, which is approximately 1600 feet south–southeast of the Solvents Recovery property, is one of six public wells maintained by the Board to provide drinking water to residents of Southington. With the exception of carbon

---

2. *Miree v. DeKalb County*, 433 U.S. 25, 27 n.2, 97 S.Ct. 2490, 2492 n.2, 53 L.Ed.2d 557 (1977); *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 515, 92 S.Ct. 609, 614, 30 L.Ed.2d 642 (1972); *Jenkins v. McKeithen*, 395 U.S. 411, 421, 89 S.Ct. 1843, 1848, 23 L.Ed.2d 404 (1969).

3. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957); *see also Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 746, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1976); *Jenkins v. McKeithen*, 395 U.S. 411, 422, 89 S.Ct. 1843, 1849, 23 L.Ed.2d 404 (1969).

4. *See* Tripp & Jaffe, *Preventing Groundwater Pollution: Towards a Coordinated Strategy to Protect Critical Recharge Zones*, 3 Harv.Envt'l L.Rev. 1, 3 n.19 (1979).

tetrachloride, each of the chemicals referred to previously has been found in Well No. 6.

Defendant Lori is engaged in the business of manufacturing security devices, tools and dies at its plant in Southington. It uses approximately 110 gallons of a degreasing solvent monthly in order to clean the metal parts which it assembles in the factory. Chlorinated hydrocarbons, including trichloroethylene, chloroform, 1,1,1 trichloroethane and dichloroethane, are major components of the degreasing solvent used by Lori. Until recently, Lori disposed of most of this spent material by dumping it into an "unlined lagoon" on its property. This "lagoon" is located approximately 250 feet southwest of Well No. 5 of the Board of Water Commissioners for the Town of Southington; Well No. 5 was a source of drinking water for the town. Lori also poured quantities of used degreasing solvent into the ground elsewhere on its property. The waste materials dumped into the ground by Lori, like those disposed of by Solvents Recovery, have "percolated" downward through the soil, contaminating the underlying groundwater. The contaminated groundwater beneath Lori's property has migrated to the aquifer in which Well No. 5 is located. All of the chlorinated hydrocarbons referred to above, except dichloroethane, have been found in Well No. 5.

Wells No. 5 and No. 6 (along with Well No. 4) have recently been removed from service by the Board of Water Commissioners as a result of tests which established the presence of toxic chlorinated hydrocarbons in these sources of drinking water.

## B. The Nature of the Plaintiff's Section 7003 Claim and Prayer for Relief

The statutory basis for Claim One of the plaintiff's complaint is section 7003 of RCRA, 42 U.S.C. § 6973, which provides:

*Imminent hazard*

Notwithstanding any other provision of this chapter, upon receipt of evidence that the handling, storage, treatment, transportation or disposal of any solid waste or hazardous waste is presenting an imminent and substantial endangerment to health or the environment, the Administrator [of the Environmental Protection Agency ("EPA")] may bring suit on behalf of the United States in the appropriate district court to immediately restrain any person contributing to the alleged disposal to stop such handling, storage, treatment, transportation, or disposal or to take such other action as may be necessary. The Administrator shall provide notice to the affected State of any such suit.

Alleging that the disposal of hazardous wastes in Southington by Solvents Recovery and Lori is presenting an "imminent and substantial endangerment to health and the environment," the United States has prayed that this court: [5]

1. [e]njoin the defendants Solvents Recovery and Lori from allowing, suffering, or causing the disposal of any hazardous waste into the ground on the defendants' property or into the groundwater and aquifer under and surrounding the defendant's property.

2. [o]rder the defendants Solvents Recovery and Lori to clean up, mitigate, and abate the pollution caused by their disposal of hazardous waste;

3. [o]rder the defendants Solvents Recovery and Lori to hire a consultant, approved by EPA, to prepare a remedial plan, also subject to EPA approval, for the cleaning up, mitigation, and abatement of the pollution caused by their disposal of hazardous waste, said plan to be prepared as expeditiously as possible and to include, but not be limited to the following:

---

5. Irrelevant to the pending motions are paragraphs 1 and 7 of the Prayer for Relief quoted above. The defendants do not contest this court's authority under section 7003 to grant the injunction requested in paragraph 1. In paragraph 7 the United States seeks relief only for the alleged violation by Solvents Recovery of the Clean Water Act, which is not part of Claim One of the complaint and is therefore not the subject of the motions to dismiss. Paragraph 7 has accordingly not been challenged in the motions to strike. *See* note 1, *supra.* The defendants have moved to strike paragraphs 2, 3, 4, 5, 6, 8 and 9 of the Prayer for Relief.

a. a program to determine the extent of contamination with chemical wastes of the soil, ground water, aquifer, and surface water on and/or surrounding the defendants' property,

b. a program to remove, neutralize, or isolate chemical wastes and contaminated soil in order to eliminate present contamination of the groundwater, aquifer, and surface water and to prevent further contamination of the groundwater, aquifer, and surface water,

c. a program for proper storage, treatment, and handling of chemical wastes on the defendants' property, and

d. a monitoring program to verify that contamination of the soil, groundwater, aquifer and surface water on and surrounding defendants' property has ceased;

4. [o]rder the defendants Solvents Recovery and Lori to implement the EPA–approved remedial plan as expeditiously as possible and to pay the expenses for implementing such EPA–approved remedial plan;

5. [o]rder the defendants Solvents Recovery and Lori to post a performance bond for the accomplishment of all necessary remedial actions, the amount of which will be determined in later proceedings;

6. [o]rder the defendants Solvents Recovery and Lori to assure that an adequate supply of drinking water is provided to residents of Southington, Connecticut;

7. [a]ssess a civil penalty against defendant Solvents Recovery not to exceed $10,000 for each day of violation of Section 301(a) of the Clean Water Act, 33 U.S.C. [§] 1311(a);

8. [o]rder the defendants Solvents Recovery and Lori to reimburse the United States for its costs in investigating, testing, and sampling the groundwater and surface water under and surrounding the defendants' property; and

9. [a]ward plaintiff the costs of this suit and such other relief as this Court finds just and appropriate.

## C. The Issues Presented by the Motions to Dismiss

Three alternative theories are advanced in support of the defendants' position that Claim One states no claim upon which relief can be granted. First, the defendants contend that section 7003 does not create any cause of action, but merely incorporates the federal common law of nuisance as the substantive body of law governing an action by the United States to abate an "imminent hazard" under that statute; as the defendants construe that developing federal common law, it provides for no cause of action unless the pollution in question is alleged to have been created in one state and exported to another, which concededly is not the case here. Second, the defendants charge that Claim One is deficient in that it fails to allege that they are still disposing of hazardous wastes; in the defendants' view, an allegation of such continuing acts of disposal is essential in an action brought under section 7003. Third, the defendants argue that, even if Claim One would otherwise state a valid claim under the federal common law of nuisance, it must fail because section 7003 was not intended to have a retroactive effect and therefore may not be applied to remedy conditions caused by conduct which occurred prior to the enactment of RCRA.

The court deals with these issues *seriatim* below, and concludes that: (a) Claim One presents a viable claim under the federal common law of nuisance, even in the absence of an allegation of interstate effects; (b) an allegation of continuing disposal is not required in an action commenced pursuant to section 7003; and (c) although some of the harm which the plaintiff seeks to abate may be attributed to pre–RCRA conduct, this case does not involve an impermissible retroactive application of a statute which imposes substantive duties, obligations or liabilities on the defendants.

### (1) Interstate Effects and the Federal Common Law in a Groundwater Pollution Case Under Section 7003

The defendants argue that section 7003 does not proscribe any particular conduct or provide the elements of any new cause of action. Rather, they contend, the "imminent hazard" provision of RCRA was designed only to provide the United States with a remedy—an action for injunctive relief in federal court—when the facts called to its attention indicate that the handling, storage, treatment, transportation or disposal of solid or hazardous waste is causing the kind of injury to health or the environment which renders appropriate the relief authorized by section 7003. According to the defendants, "[n]either RCRA as a whole, nor § 7003, defines the factual or legal basis for any person's liability or the substantive rules of decision to be applied."[6]

The defendants' position finds support in the only applicable precedent under section 7003. In *United States v. Midwest Solvent Recovery, Inc.*, 484 F.Supp. 138, 143–44 (N.D.Ind.1980), the court treated section 7003 as merely a grant of federal jurisdiction, holding that the substantive principles which govern an action for equitable relief commenced under that section are to be found in the common law.

The court in *Midwest Solvent Recovery* noted that the legislative history of section 7003 is "quite sketchy," 484 F.Supp. at 143, and does not support the proposition that section 7003 was intended to establish standards for the conduct of private parties. *Id.* at 143–44. To the contrary, as the court observed in *Midwest Solvent Recovery*, section 7003 is a part of subchapter VII of RCRA, which bears the title "Miscellaneous Provisions." This subchapter is to be distinguished from other subchapters of the statute, which are clearly substantive in nature and provide that the EPA shall promulgate regulations governing a wide range of conduct relating to the management of the problems posed by hazardous wastes. *See, e. g.,* 42 U.S.C. §§ 6922–25; *cf.* 42 U.S.C. § 6928 (providing for civil and criminal actions to enforce compliance with substantive provisions of RCRA).

Absent any indication that section 7003 was intended to establish standards which could be used as a basis for determining liability, the court in *Midwest Solvent Recovery* found that the broadly framed "imminent hazard" provision could not fairly be interpreted as a source of substantive duties or liabilities:

> [B]ecause § 7003 is as broadly worded as it is, if it were intended to function as a liability–creating provision, it would appear to make liable even those who contribute to the handling, storage treatment, transportation or disposal of solid or hazardous wastes in such a way that an imminent and substantial endangerment to health or the environment is created. Any provision that could logically be read so to expand the set of persons liable under the federal solid and hazardous waste regulatory scheme would surely be identified as such in the legislative history. Finally, [RCRA] elsewhere establishes by regulations the standards of conduct that must be followed by those who generate, transport, or own or operate facilities that treat, store, or dispose of hazardous wastes.

*Id.* at 144.

This reasoning is persuasive. Section 7003 provides a jurisdictional basis and an enforcement device for the government in cases where it has reason to believe that wrongful conduct with respect to solid or hazardous wastes presents an imminent threat of harm to health or the environment, and authorizes federal courts to

---

**6.** Brief in Support of Defendant Solvents Recovery's Motion to Dismiss Claim One of the Complaint and/or to Strike Paragraphs 2, 3, 4, 5, 6, 8 and 9 of the Prayer for Relief (hereafter "Brief of Solvents Recovery"), p. 20. Since Lori has expressly adopted the positions espoused by Solvents Recovery in its Brief and Reply Brief, *see* Memorandum in Support of Defendant Lori Engineering Company's Motion to Dismiss Complaint and/or Strike Prayers for Relief, p. 3, the arguments in the Solvents Recovery briefs will be referred to herein as the arguments of both defendants.

grant equitable relief in such cases. However, section 7003 does not itself establish standards for determining the lawfulness of the conduct of those sued by the United States. In an appropriate case, those standards might be found elsewhere in RCRA or in the regulations promulgated pursuant to RCRA,[7] or in the federal common law of nuisance, which is evolving to meet a variety of pollution problems.[8]

The Supreme Court gave life to this body of federal common law in *Illinois v. City of Milwaukee*, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972). There, the Court held that a federal district court had the authority to entertain an action brought by the State of Illinois to abate a public nuisance created by the defendants' pollution of Lake Michigan. Until federal statutes and regulations preempted the field, the Court stated, "federal courts will be empowered to appraise the equities of the suits alleging creation of a public nuisance by water pollution." *Illinois v. City of Milwaukee, su-*

pra, 406 U.S. at 107, 92 S.Ct. at 1395. The basis for this federal cause of action—which the Court held to exist even in the absence of express statutory authorization for a lawsuit—was the strong federal interest in controlling certain types of pollution and protecting the environment. In the area of navigable waters, with which the Court was concerned in *Illinois v. City of Milwaukee*, this federal interest was manifested in several federal statutes concerning the preservation of clean waters. *See id.* at 101–03, 92 S.Ct. at 1391–1393.

■ The defendants here do not dispute that the federal common law of nuisance, which evolved in the context of the pollution of navigable and interstate waters[9] and is also applicable to pollution of the air,[10] is the source of any substantive rights which the United States may have in cases, such as this one, involving groundwater pollution. However, the defendants argue vigorously that a *sine qua non* of a federal common law nuisance claim to abate pollu-

---

7. By the terms of RCRA, the EPA was to have promulgated regulations no later than October 21, 1977 (in the case of regulations required by 42 U.S.C. § 6944(a)) and April 21, 1978 (under 42 U.S.C. §§ 6921(b), 6922, 6923(a), 6924 and 6925(a)). However, the EPA was unable to meet either those deadlines or a "timetable" established by the United States District Court for the District of Columbia in January 1979 for the promulgation of regulations under 42 U.S.C. §§ 6921 *et seq.* In an effort to meet the amended schedule established by that court in December 1979, the first part of these final regulations was published on February 26, 1980, *see* 45 Fed.Reg. 33066 *et seq.* The role of the federal court in this process, in the cases consolidated *sub nom. Illinois v. Costle,* No. 78–1689 (D.D.C., filed Nov. 7, 1978), is described in *Citizens for a Better Environment v. Costle,* 617 F.2d 851, 852 & n.3 (D.C.Cir.1980) (per curiam) (holding that plaintiffs' request that EPA be required to provide standards for sewage sludge in the hazardous waste regulations still being promulgated under RCRA was not ripe for adjudication).

8. *See generally* Note, *Federal Common Law Remedies for the Abatement of Water Pollution,* 5 Fordham Urb.L.J. 549 (1977); Note, *Environmental Law—Federal Common Law and Intrastate Pollution,* 13 Wake Forest L.Rev. 246 (1977). The federal common law of nuisance in pollution cases is one example of the "specialized common law" which has been developed in areas of federal concern since *Erie Railroad*

*Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), repudiated the notion of a general federal common law. *See* Friendly, *In Praise of Erie—and of the New Federal Common Law,* 39 N.Y.U.L.Rev. 383 (1964).

9. *See, e. g., Illinois v. City of Milwaukee,* 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972); *Illinois v. Outboard Marine Corp.,* 619 F.2d 623 (7th Cir. 1980), *petition for cert. filed,* 49 U.S. L.W. 3043 (U.S. July 28, 1980); *National Sea Clammers Association v. City of New York,* 616 F.2d 1222 (3d Cir. 1980), *petitions for cert. filed,* 48 U.S.L.W. 3736 (U.S. Apr. 29, 1980) (No. 79–1711), 48 U.S.L.W. 3752 (U.S. May 5, 1980) (Nos. 79–1754 & 79–1760) and 49 U.S. L.W. 3014 (U.S. July 3, 1980) (No. 80–12); *United States v. Ira S. Bushey & Sons, Inc.,* 346 F.Supp. 145 (D.Vt.1972).

10. In *Reserve Mining Co. v. EPA,* 514 F.2d 492, 520–21 (8th Cir. 1975), the court held that the federal common law of nuisance was not applicable to a claim of air pollution in the absence of interstate effects. However, by implication, the court in *Reserve Mining* recognized that the doctrine of *Illinois v. City of Milwaukee,* 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972), applies to air pollution cases. *Cf. Georgia v. Tennessee Copper Co.,* 206 U.S. 230, 237–38, 27 S.Ct. 618, 619–20, 51 L.Ed. 1038 (1907), *quoted in Illinios v. City of Milwaukee, supra,* 406 U.S. at 104–05, 92 S.Ct. at 1393–94.

tion of any kind is some sort of interstate effect. Because the pollution in question here is alleged to have occurred only within the State of Connecticut, the defendants contend, there is no basis in federal common law for Claim One of the plaintiff's complaint.

The defendants' argument is based on a number of cases in which an interstate effect—*i. e.*, pollution having its origin in one state and its effect in another—has been viewed as a necessary condition to a federal cause of action for common law nuisance. *See Ancarrow v. City of Richmond*, 600 F.2d 443, 445 (4th Cir.), *cert. denied*, 444 U.S. 992, 100 S.Ct. 523, 62 L.Ed.2d 421 (1979) (pollution of navigable waters); *Committee for Consideration of Jones Falls Sewage System v. Train*, 539 F.2d 1006, 1010 (4th Cir. 1976) (pollution of navigable waters); *Reserve Mining Co. v. EPA*, 514 F.2d 492, 520–21 (8th Cir. 1975) (air pollution); *Parsell v. Shell Oil Co.*, 421 F.Supp. 1275, 1281 (D.Conn.1976) (Newman, J.), *aff'd without opinion sub nom. East End Yacht Club v. Shell Oil Co.*, 573 F.2d 1289 (2d Cir. 1977) (pollution of navigable waters).

■ However, as the plaintiff points out, there is authority holding that no such interstate effects need be alleged or demonstrated in a case involving pollution of navigable waters. In a persuasive opinion by Judge Wisdom, sitting by designation, the Court of Appeals for the Seventh Circuit recently held:

> We conclude, based on *Illinois v. Milwaukee* and the Federal Water Pollution Control Act, that there is an overriding federal interest in preserving, free of pollution, our interstate and navigable waters. *When a pollution controversy arises, it is immaterial whether there is a showing of extraterritorial pollution effects.* The issue is whether the dispute is a matter of federal concern. When it is, as in this case, federal courts should be accessible.

*Illinois v. Outboard Marine Corp.*, 619 F.2d 623, 630 (7th Cir. 1980) (emphasis added), *petition for cert. filed*, 49 U.S.L.W. 3043 (U.S. July 28, 1980). *See also In re Oswego*

*Barge Corp.*, 439 F.Supp. 312, 322 (N.D.N.Y. 1977) (denying cross-motion to dismiss federal common law claim for pollution of navigable waterway affecting only one state); *United States ex rel. Scott v. United States Steel Corp.*, 356 F.Supp. 556 (N.D.Ill.1973) (denying motion to dismiss claim for federal common law nuisance for intrastate pollution of Lake Michigan); *United States v. Ira S. Bushey & Sons, Inc.*, 346 F.Supp. 145 (D.Vt.1972) (Oakes, J.) (denying motion to dismiss claim under federal common law of nuisance for pollution of Lake Champlain and Burlington Harbor; no mention of interstate effects); *Id.*, 363 F.Supp. 110, 120–21 (D.Vt.) (order for injunctive relief, partly on the basis of federal common law, in same case), *aff'd without opinion*, 487 F.2d 1393 (2d Cir. 1973), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3182, 41 L.Ed.2d 1146 (1974); *cf. Stream Pollution Control Board v. United States Steel Corp.*, 512 F.2d 1036, 1040 (7th Cir. 1975) (Stevens, J.).

There is no need for this court to consider whether interstate effects need be pleaded in an action under the federal common law of nuisance to abate pollution of the air or of a navigable waterway. The question presented here, while analogous, arises in a different statutory and factual context. The court is called upon to decide, apparently as a matter of first impression, whether a federal common law claim arising out of *groundwater* pollution is defective for failure to allege interstate effects.

The question presented in this case requires the court to apply the doctrine of *Illinois v. City of Milwaukee* to a type of pollution and a statutory framework to which it has not yet explicitly been applied. In doing so, the court looks for guidance to the rationale for the federal common law cause of action which, the Supreme Court has held, governs other pollution cases. In *Illinois v. City of Milwaukee*, the Court noted that "where there is an overriding federal interest in the need for a uniform rule of decision . . . we have fashioned federal common law." 406 U.S. at 105 n. 6, 92 S.Ct. at 1393 n. 6. The appropriate question in a pollution case to which

the federal common law may apply is "whether the dispute is a matter of federal concern," *Illinois v. Outboard Marine Corp., supra,* 619 F.2d at 630; if so, the federal common law of nuisance governs, thereby providing the uniformity required by the federal interest in the matter and "fill[ing] the statutory interstices." *Id.; see also National Sea Clammers Association v. City of New York, supra,* 616 F.2d 1222, 1233 (3d Cir. 1980), *petitions for cert. granted* — U.S. ——, 101 S.Ct. 314, —— L.Ed.2d —— (1981).

The enactment of RCRA in 1976 is evidence of the strong federal interest in preventing and abating incidents of groundwater pollution caused by the disposal of hazardous wastes. As the defendants point out, pollution of groundwater was historically a concern of state and local authorities, and until recently the federal government was not much involved in this area.[11] However, RCRA is the product of a considered legislative decision to enter this field, consistently with Congress' authority under the interstate commerce clause of the United States Constitution,[12] in order to protect the health and environment of citizens. The House Report in support of the legislation which became RCRA emphatically states the intention of Congress "to enter

[this] area which has traditionally been considered the sphere of local responsibility." H.R.Rep. No. 94–1491, 94th Cong., 2d Sess. 3, *reprinted in* [1976] U.S.Code Cong. & Admin. News, pp. 6238, 6240.

In recommending the enactment of RCRA, "[t]he overriding concern" of the House Committee on Interstate and Foreign Commerce was

the effect on the population and the environment of the disposal of discarded hazardous wastes—those which by virtue of their composition or longevity are harmful, toxic or lethal. Unless neutralized or otherwise properly managed in their disposal, hazardous wastes present a clear danger to the health and safety of the population and to the quality of the environment. In addition, much of the hazardous waste disposed of in an environmentally [un]sound manner is in interstate commerce without adequate monitoring of its movement or disposition.

H.R.Rep. No. 94–1491, 94th Cong., 2d Sess. 3, *reprinted in* [1976] U.S. Code & Admin. News, p. 6241.

The federal character of the problem was underscored, as the legislative history of RCRA discloses, by the relationship of the disposal of hazardous wastes [13] to the fields of air and navigable water pollution, in

---

11. *See generally* Davis, *Groundwater Pollution: Case Law Theories for Relief,* 39 Mo.L.Rev. 117 (1974). However, even before the enactment of RCRA, Congress had taken steps which demonstrated a growing federal interest in the problems caused by the disposal of solid and hazardous wastes, adopting the Solid Waste Disposal Act of 1965, Pub.L. No. 89–272, and the Resource Recovery Act of 1970, Pub.L. No. 91-512, which have been superseded by the more comprehensive RCRA. *See also* Toxic Substances Control Act, 15 U.S.C. §§ 2601–2629 (concerning, *inter alia,* disposal problems posed by toxic chemicals; section 6(a) of the Act, 15 U.S.C. § 2606(a), provides for relief in cases of disposal of "an imminently hazardous chemical substance"); Safe Drinking Water Act of 1974, 42 U.S.C. §§ 300f–300j–10 (establishing regulatory program to ensure the quality of publicly supplied drinking water, including some protection against groundwater pollution).

12. U.S.Const., art. I, § 8., cl. 3. *The defendants do not challenge the constitutionality of section*

7003 or a federal cause of action, on behalf of the United States, for the abatement of intrastate groundwater pollution. *See* Brief of Solvents Recovery, pp. 21–22 & 22 n.13. *Cf. Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 258, 85 S.Ct. 348, 358, 13 L.Ed.2d 258 (1964); *Wickard v. Filburn,* 317 U.S. 111, 125, 63 S.Ct. 82, 89, 87 L.Ed. 122 (1942). The defendants' argument is, rather, that "in enacting RCRA, and § 7003 in particular, Congress has not sought to exercise the full extent of its powers to prescribe rights and remedies with respect to ground water contamination on a local level. . . ." Brief of Solvents Recovery, p. 22.

13. For purposes of RCRA, "hazardous waste" is defined as:

a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may–

(A) cause, or significantly contribute to an increase in mortality or an increase in seri-

which the federal interest had already been manifested by comprehensive legislation:

> The Committee [on Interstate and Foreign Commerce] believes that the approach taken by this legislation eliminates the last remaining loophole in environmental law, that of unregulated land disposal of discarded materials and hazardous wastes. Further, the Committee believes that this legislation is necessary if other environmental laws are to be both cost and environmentally effective. At present the federal government is spending billions of dollars to remove pollutatns [sic] from the air and water, only to dispose of such pollutants on the land in an environmentally unsound manner. The existing methods of land disposal often result in air pollution, subsurface leachate and surface run–off, which affect air and water quality. This legislation will eliminate this problem and permit the environmental laws to function in a coordinated and effective way.

H.R.Rep. No. 94–1491, 94th Cong., 2d Sess. 4, *reprinted in* [1976] U.S. Code Cong. & Admin. News, pp. 6241–42.

> ous irreversible, or incapacitating reversible, illness; or
> (B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.

42 U.S.C. § 6903(5).
The term "solid waste," in turn, is defined to include:

> any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities, but does not include solid or dissolved material in domestic sewage, or solid or dissolved materials in irrigation return flows or industrial discharges which are point sources subject to permits under section 1342 of Title 33, or source, special nuclear, or byproduct material as defined by the Atomic Energy Act of 1954, as amended (68 Stat. 923).

42 U.S.C. § 6903(27). Accepting as true the allegations of the complaint, the organic chemicals in question in this case constitute both "solid waste" and "hazardous waste," within the meaning of RCRA. The defendants have

The concerns expressed in the House Report were echoed in Congressional findings which are part of RCRA. These findings eliminate any doubt that by 1976 Congress had deemed the disposal of hazardous wastes an important federal concern, which was related to other types of pollution already extensively regulated by federal law, and which required uniform federal standards.[14] The following excerpts from RCRA illustrate the federal interest in regulating the disposal of solid and hazardous wastes on land:

> The Congress finds with respect to solid waste—
>
> . . . . .
>
> (4) that while the collection and disposal of solid wastes should continue to be primarily the function of State, regional, and local agencies, the problems of waste disposal as set forth above have become a matter national in scope and in concern and necessitate Federal action through financial and technical assistance and leadership in the development, demon-

not argued that the statutory definitions are inapplicable.

14. The defendants note that RCRA allows the states to enforce and administer the federal statute, and that Congress deferred to traditional local concerns in several regards. *See* Brief of Solvents Recovery, pp. 33–36, 41–42. RCRA nonetheless manifests a strong federal interest in the matters it addresses, since it provides for *federal* standards which EPA is to promulgate and which either EPA or the states may enforce. The House Report makes clear Congress' insistence on uniform federal standards:

> [I]f at anytime [sic] a State wishes to take over the hazardous waste program it is permitted to do so, *provided that the state laws meet the Federal minimum requirements for both administering and enforcing the law.*

H.R.Rep. No. 79-1491, 94th Cong., 2d Sess. 24, *reprinted in* [1976] U.S. Code Cong. & Admin. News, p. 6262 (emphasis added). *See* 42 U.S.C. § 6926(b) (authorizing state hazardous waste programs, to be approved by EPA Administrator, unless they are not equivalent to federal program, or are inconsistent with programs applicable in other states, or do not "provide adequate enforcement [or] compliance with the requirements of" RCRA).

stration, and application of new and improved methods and processes to reduce the amount of waste and unsalvageable materials and to provide for proper and economical solid waste disposal practices.

42 U.S.C. § 6901(a)(4).

The Congress finds with respect to the environment and health that—

. . . . .

(4) open dumping is particularly harmful to health, contaminates drinking water from underground and surface water supplies, and pollutes the air and the land;

(5) hazardous waste presents, in addition to the problems associated with non-hazardous solid waste, special dangers to health and requires a greater degree of regulation than does non–hazardous solid waste . . . . .

42 U.S.C. § 6901(b)(4), (5).

When it enacted RCRA, Congress determined that the national problem posed by hazardous wastes was closely related to other types of pollution problems which had long been matters of federal concern. Indeed, Congress explicitly found that the federal efforts to abate and remedy other types of pollution were, ironically, contributing to the problem of increasing amounts of material which required disposal:

The Congress finds with respect to the environment and health, that—

. . . . .

(3) As a result of the Clean Air Act, the Water Pollution Control Act, and other Federal and State laws respecting public health and the environment, greater amounts of solid waste (in the form of sludge and other pollution treatment residues) have been created. Similarly, inadequate and environmentally unsound practices for the disposal or use of solid waste have created greater amounts of air and water pollution and other problems for the environment and for health.

42 U.S.C. § 6901(b)(3).

One of the stated objectives of RCRA was:

to promote the protections of health and the environment and to conserve valuable material and energy resources by–

. . . . .

(3) prohibiting future open dumping on the land and requiring the conversion of existing open dumps to facilities which do not pose a danger to the environment or to health;

(4) regulating the treatment, storage, transportation, and disposal of hazardous wastes which have adverse effects on health and the environment.

42 U.S.C. § 6902(3), (4).

The legislative history and statutory provisions outlined above establish that there is a sufficiently strong federal interest in preventing and abating groundwater pollution caused by the disposal of hazardous wastes, and in having a uniform body of federal law governing controversies involving such pollution, to justify the application of federal law to cases such as this one. This conclusion is in no way altered by the lack of an interstate effect in any particular case, for, as Congress was well aware when it enacted RCRA, groundwater pollution caused by the disposal of hazardous wastes rarely crosses state lines. The House Report recounted dozens of incidents of intrastate injury resulting from the improper disposal of hazardous wastes (including over thirty incidents–one in Connecticut–where "leachate from land disposal sites contaminated drinking–water wells") and indicated that RCRA was designed, in part, to prevent such harm to the environment and public health. H.R.Rep. No. 94–1491, 94th Cong., 2d Sess. 17–23, 37–38, *reprinted in* [1976] U.S. Code Cong. & Admin. News, pp. 6254–61, 6274–76.

■ If it is evident that the federal interest which underlies RCRA generally is not limited to the rare incident of groundwater pollution which occurs at a state line, and in which the pollutants actually cross an interstate border (or migrate into an interstate body of navigable water), it is equally clear that the particular provision of RCRA invoked by the United States here—section 7003—was meant to apply to cases of purely

intrastate groundwater pollution. The final sentence of section 7003 reads:

> The Administrator [of EPA] shall provide notice to the affected State of any such suit.

42 U.S.C. § 6973. The use of the singular "State" is not only consistent with the common sense realization that nearly every occasion for the use of section 7003 will involve only one state. It is also an indication that the federal common law of nuisance which governs section 7003 actions must, to be consistent with Congress' purposes, remain free of an illogical "interstate effects" requirement.

■ As noted previously, this court is not now called upon to decide whether interstate effects need be pleaded in a complaint asserting a federal common law action for pollution of the air or of the navigable waters of the United States. However, in the groundwater pollution context, conditioning a section 7003 claim on the allegation of such interstate effects would be fundamentally inconsistent with the character of the pollution which is the target of the legislation and incompatible with the nature and extent of the federal concern embodied in RCRA. Indeed, such a limitation would virtually read section 7003 out of the statute. Accordingly, the court holds that Claim One of the plaintiff's complaint is not deficient for failure to plead any extraterritorial effects of the defendants' acts of disposal, and states a cause of action under the applicable federal common law of nuisance, even though the pollution which is its subject matter may have been confined within the town limits of Southington, Connecticut.

### (2) Continuing Disposal as a Prerequisite for an Action Under Section 7003

The voluntary conduct of the defendants which, the plaintiff claims, caused the contamination of the municipal water wells in Southington has apparently ceased. The United States alleges that Solvents Recovery disposed of toxic chemical wastes in an environmentally unsound matter "[u]ntil 1979,"[15] and that Lori did so "[u]ntil recently."[16] The defendants argue that the absence of an allegation that they are still engaging in acts of disposal is fatal to Claim One of the plaintiff's complaint.

In determining the merits of this contention, the court need not concern itself with the preliminary semantical question—to which the parties have devoted many pages in their briefs—whether "disposal," as defined in RCRA,[17] includes the continuing leaking, leaching or migration of inanimate hazardous wastes (many of which were dumped years ago) below the earth's surface, or whether that term is limited to those volitional acts of persons employed by the defendants which cause wastes to reach land or water. For the purposes of this discussion, it may be assumed *arguendo,* as the defendants contend, that "disposal" means only human conduct which results in hazardous materials being placed on or into land or water. The defendants' ultimate argument that continuing "disposal" (as so defined) need be alleged under section 7003 must nonetheless be rejected, for the court is unable to find anything in the statute which would restrict its application to cases in which the government alleges that the disposal continued up to the time of the filing of its lawsuit.

Section 7003 is designed to abate and remedy conditions which constitute imminent hazards to health or the environment. Its focus is on the prevention and amelioration of conditions, rather than the cessation of any particular affirmative human conduct. The statute applies when the Administrator of EPA is informed "that the han-

---

15. Complaint, ⸲ 13.

16. Complaint, ⸲ 21.

17. Section 1003(3) of RCRA provides:
 The term "disposal" means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters. 42 U.S.C. § 6903(3).

dling, storage, treatment, transportation or disposal of any solid waste or hazardous waste *is presenting* an imminent substantial endangerment to health or the environment." 42 U.S.C. § 6973 (emphasis added). In cases involving conditions caused by the disposal of hazardous wastes, section 7003 by its terms requires only that the disposal "is presenting an imminent . . . endangerment"; it makes no distinction on the basis of the cause of the dangerous condition. Section 7003 does not on its face discriminate between cases of a present harm caused by past disposal practices and cases of a present harm caused by ongoing disposal practices. The defendants' narrow reading of the statute is therefore not supported by the language of section 7003.

■ Moreover, three factors convince the court that no "continuing acts" limitation should be read into this remedial legislation. First, section 7003 authorizes a court not only to restrain the "handling, storage, treatment, transportation, or disposal" which caused the hazardous condition, but also to order the parties responsible for the hazardous condition "to take such other action as may be necessary" to abate the imminent hazard. The latter phrase implies that section 7003 may be invoked even where a simple restraining order would be unavailing because the defendants had already desisted from the disposal practices which caused the pollution. In this regard, it is significant that in *United States v. Vertac Chemical Corp.*, 489 F.Supp. 870 (E.D.Ark.1980), the court issued an order for injunctive relief under section 7003 which required the defendant to contain pollution that could only be traced to acts of disposal antedating the filing of the complaint.

Second, as noted above, section 7003 is principally a jurisdictional statute providing a forum for actions by the United States for injunctive relief; lawsuits brought under that statute are governed (as the defendants have persuasively argued) by the substantive federal common law of nuisance. It would be inconsistent with that body of law to limit the application of section 7003 to cases of continuing volitional acts of disposal. Nuisance law is peculiarly concerned with the existence of a dangerous or noxious condition, and focuses on the results of a defendant's conduct, rather than on the nature of what he has done. Nuisance liability "has reference to the interests invaded, to the damage or harm inflicted, and not to any particular kind of act or omission which has led to the invasion." W. Prosser, Law of Torts 573 (4th ed. 1971). *See also Restatement (Second) of Torts* § 822, Comment a (1977).

Third, although the legislative history of section 7003 is silent on this question of statutory interpretation, the subsequent Report on Hazardous Waste Disposal by the Subcommittee on Oversight and Investigations of the House Committee on Interstate and Foreign Commerce, 96th Cong., 1st Sess. (Comm.Print 1979) (the "Oversight Report"), strongly supports the view that section 7003 applies to *imminent hazards arising out of disposal practices which ceased before the commencement of the* government's lawsuit. That report states, *inter alia* : [18]

As the previous description reveals, RCRA is basically a prospective act de-

---

**18.** Such a subsequent report is not part of the legislative history of RCRA and therefore lacks the probative value as to legislative intent that contemporaneous statements of Congress' purpose would have. *See Waterman Steamship Corp. v. United States*, 381 U.S. 252, 269, 85 S.Ct. 1389, 1398, 14 L.Ed.2d 370 (1965); *United States v. Philadelphia National Bank*, 374 U.S. 321, 348–49, 83 S.Ct. 1715, 1733–34, 10 L.Ed.2d 915 (1963); *United States v. Price*, 361 U.S. 304, 313, 80 S.Ct. 326, 331, 4 L.Ed.2d 334 (1960). Nonetheless, it is entitled to considerable weight as a kind of "expert opinion" concerning the meaning and proper interpretation of the statute, especially in view of Congress' contemporaneous silence on the question at issue here. *See Sioux Tribe of Indians v. United States*, 316 U.S. 317, 329–30, 62 S.Ct. 1095, 1100–01, 86 L.Ed. 1501 (1942); *Parker v. Califano*, 561 F.2d 320, 339 (D.C.Cir.1977); *Mount Sinai Hospital of Greater Miami, Inc. v. Weinberger*, 517 F.2d 329, 343 (5th Cir.), *modified in part on other grounds on petition for rehearing*, 522 F.2d 179 (5th Cir. 1975) (per curiam), *cert. denied*, 425 U.S. 935, 96 S.Ct. 1665, 48 L.Ed.2d 176 (1976); 2A A. Sutherland, Statutes and Statutory Construction § 49.11 at 266 (4th ed., Sands ed., 1973).

signed to prevent improper disposal of hazardous wastes in the future. *The only tool that it has to remedy the effects of past disposal practices which were not sound is its imminent hazard authority.*

. . .

Section 7003 is designed to provide the Administrator [of EPA] with overriding authority to respond to situations involving a substantial endangerment to health or the environment, regardless of other remedies available through the provisions of the Act. . . .

*Imminence in this section applies to the nature of the threat rather than identification of the time when the endangerment initially arose. The section, therefore, may be used for events which took place at some time in the past but which continue to present a threat to the public health or the environment.*

Oversight Report, *supra*, at 31–32 (emphasis added).

 For these reasons, the court is not persuaded that an allegation of continuing disposal by the defendants is a prerequisite to the maintenance by the United States of an action under section 7003. Therefore, the plaintiff's failure to allege that Solvents Recovery and Lori were still dumping hazardous chemical waste products on their properties in Southington as of December 17, 1979, when the complaint was filed, is not fatal to this section 7003 claim.

*(3) Retroactivity in the Application of Section 7003*

Somewhat related to the argument that an allegation of continuing disposal prac-

tices is required in a section 7003 action is the defendants' contention that section 7003 cannot be utilized "retroactively," *i.e.,* to provide a remedy for a condition which was created by conduct antedating the enactment of RCRA in 1976.[19] This contention is, to a degree, based on a faulty premise, since the United States does allege that Solvents Recovery disposed of hazardous chemical wastes on its property until 1979, three years after RCRA became law.[20] However, the defendants' claim of impermissible retroactivity must fail for a more fundamental reason.

While the proposition that a statute operates prospectively only, unless a contrary intention appears, *see Brewster v. Gage,* 280 U.S. 327, 337, 50 S.Ct. 115, 117, 74 L.Ed. 457 (1930),[21] is undoubtedly true, that rule has no application to the plaintiff's use of section 7003 here. As the Supreme Court has stated, in a definition quoted by the defendants,[22] a retroactive statute is one which "creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past." *Sturges v. Carter,* 114 U.S. 511, 519, 5 S.Ct. 1014, 1018, 29 L.Ed. 240 (1885), *quoting Society for Propagation of the Gospel v. Wheeler,* 22 Fed.Cas. 756, 767 (C.C.D.N.H. 1814) (No. 13,156) (Story, J.). *See also Neild v. District of Columbia,* 110 F.2d 246, 254 (D.C.Cir.1940); *Clifford Jacobs Motors, Inc. v. Chrysler Corp.,* 357 F.Supp. 564, 571 (S.D. Ohio 1973).

 Under that definition, section 7003 is not a retroactive statute, for (to para-

19. This argument is not premised on the constitutional prohibition of *ex post facto* laws or any other provision of the United States Constitution. The defendants only argue that Congress did not intend that section 7003 apply to the results of conduct which predated its enactment. *See* Brief of Solvents Recovery, pp. 57–61; Reply Brief of Solvents Recovery, p. 14.

20. Complaint, ¶ 13. It is not entirely clear from the vague allegation that Lori disposed of chlorinated solvents on its property "[u]ntil recently" whether any of Lori's acts allegedly took place after the enactment of RCRA, *see* Complaint, ¶ 21, but the government's term

would appear to embrace the three year period preceding the filing of the complaint.

21. *See also Greene v. United States,* 376 U.S. 149, 160, 84 S.Ct. 615, 621, 11 L.Ed.2d 576 (1964); *Union Pacific Railroad Co. v. Laramie Stock Yards Co.,* 231 U.S. 190, 199, 34 S.Ct. 101, 102, 58 L.Ed. 179 (1913); Smead, *The Rule Against Retroactive Legislation: A Basic Principle of Jurisprudence,* 20 Minn.L.Rev. 775 (1936).

22. Brief of Solvents Recovery, p. 58; Reply Brief of Solvents Recovery, p. 14.

phrase the venerable words of Mr. Justice Story) it does not create any new obligations, impose any new duties, or attach any new disabilities. Rather, as the defendants have urged,[23] and as this court holds today,[24] section 7003 is merely a jurisdictional and remedial statute, which allows the United States to sue in a federal court for injunctive relief to abate and remedy certain imminent hazards caused by the disposal of hazardous wastes. Since section 7003 is concededly not substantive in nature, any obligations, duties, disabilities or liabilities which may be imposed upon defendants in an action under that statute are created by the federal common law of nuisance, rather than by the terms of section 7003. In the absence of any indication that this federal body of nuisance law is likely to exceed significantly in scope or severity the state law of nuisance to which the defendants were already subject when they engaged in their pre–RCRA disposal practices,[25] there

is nothing impermissibly retroactive about the application of section 7003 to the facts pleaded in the plaintiff's complaint.[26] The plaintiff's invocation of section 7003 does not penalize the defendants for past behavior which might not otherwise have been actionable under applicable state nuisance law. Claim One is therefore not invalid as a retroactive application of a statute.[27]

## II. THE MOTIONS TO STRIKE

The apparent premise of the defendants' motions to strike is that even if Claim One states a claim upon which relief may be granted, the relief which this court may award the plaintiff is limited to a simple injunction restraining the defendants from disposing of hazardous wastes.[28] The defendants therefore seek an order striking from the Prayer for Relief paragraphs 2, 3, 4, 5, 6, 8, and 9, in which the plaintiff seeks

**23.** *See* Brief of Solvents Recovery, p. 20; Reply Brief of Solvents Recovery, pp. 1–2, 4–5, 8, 20–21.

**24.** *See* pp. 1133–1134, *supra; see also United States v. Midwest Solvent Recovery, Inc.*, 484 F.Supp. 138, 143–44 (N.D.Ind.1980).

**25.** *See generally Swift & Co. v. Peoples Coal & Oil Co.*, 121 Conn. 579, 186 A. 629 (1936); *Commonwealth v. Barnes & Tucker Co.*, 455 Pa. 392, 410–14, 319 A.2d 871, 881–83 (1974); *Restatement (Second) of Torts* §§ 821B, 832 and comment g to § 821B (1977); Oakes, *Environmental Litigation: Current Developments and Suggestions for the Future*, 5 Conn.L.Rev. 531, 546–51 (1973); Prosser, *Private Action for Public Nuisance*, 52 Va.L.Rev. 997 (1966). *Cf. In re Oswego Barge Corp.*, 439 F.Supp. 312, 322 n.9 (N.D.N.Y.1977) (applying federal common law of nuisance, and finding no "substantial differences" between it and the New York law of common nuisance).

**26.** The mere fact that the complaint in a section 7003 action may refer to pre–RCRA acts that allegedly caused or contributed to the imminent hazard which the government seeks to abate or remedy does not make the statute a retroactive one. "A statute is not rendered retroactive merely because the facts or requisites upon which its subsequent action depends, or some of them, are drawn from a time antecedent to the enactment." *Reynolds v. United States*, 292 U.S. 443, 449, 54 S.Ct. 800, 803, 78 L.Ed. 1353 (1934); *see also Savorgnan v. United States*, 338 U.S. 491, 504 n.21, 70 S.Ct. 292, 299 n.21, 94 L.Ed. 287 (1950); *Lewis*

*v. Fidelity & Deposit Co.*, 292 U.S. 559, 571, 54 S.Ct. 848, 853, 78 L.Ed. 1425 (1934); *Cox v. Hart*, 260 U.S. 427, 435, 43 S.Ct. 154, 157, 67 L.Ed. 332 (1922).

**27.** It is noteworthy that in *United States v. Vertac Chemical Corp.*, 489 F.Supp. 870 (E.D. Ark.1980), the court issued a preliminary injunction against defendant Vertac, even though the waste disposal activities of Vertac's predecessor (which was reorganized into Vertac) that caused or contributed to the imminent hazard dated back as far as 1971. *See* p. 1140, *supra.* The court apparently did not consider the granting of such relief against Vertac to be a retroactive application of RCRA to pre–RCRA conduct. Although Vertac did not make the retroactivity argument, its co–defendant raised this objection to the plaintiff's attempt to impose such liability on it; since the court found it unnecessary to grant injunctive relief against Vertac's co–defendant, it did not reach the merits of the retroactivity argument. 489 F.Supp. at 888.

**28.** The rule authorizing motions to strike provides that, "upon motion made by a party . . . the court may order stricken from any pleading any insufficient defense or any *redundant, immaterial, impertinent, or scandalous matter.*" Rule 12(f), Fed.R.Civ.P. (emphasis added). The defendants' briefs do not specify the type of material impermissible under Rule 12(f) which, in their view, is contained in the Prayer for Relief.

an order requiring the defendants to: "clean up, mitigate and abate the pollution caused by their disposal of hazardous waste"; hire an EPA–approved consultant and prepare a remedial plan subject to EPA approval; implement the EPA–approved remedial plan at their own cost; post a performance bond for "all necessary remedial actions"; "assure that an adequate supply of drinking water is provided to residents of Southington, Connecticut"; reimburse the United States for the costs which it incurred in "investigating, testing, and sampling the groundwater and surface water under and surrounding the defendants' property"; and pay the United States the costs of the action.

While the affirmative relief which the plaintiff seeks in this complaint is indeed broad and would not be warranted absent a showing that it was essential to abate and remedy an imminent hazard to the public health and environment, the court cannot agree with the defendants that the relief sought is, as a matter of law, unauthorized. Section 7003 provides that, in addition to a simple restraining order, the court may require the defendant "to take such other action as may be necessary" to prevent imminent harm. 42 U.S.C. § 6973. The defendants' argument would reduce this broad language to the status of surplusage. The injunctions issued in the two reported cases decided under section 7003 thus far illustrate that this provision may be the basis for equitable relief other than an order simply restraining the disposal of hazardous materials. *See United States v. Vertac Chemical Corp., supra,* 489 F.Supp. at 888–89 (granting preliminary injunctive relief under section 7003, including the covering of soil containing hazardous chemicals with a clay topping, the construction of an underground clay barrier to pre-vent migration of buried chemical wastes, and the institution of "systematic sampling procedures" by the defendant); *United States v. Midwest Solvent Recovery, Inc., supra,* 484 F.Supp. at 145 (granting preliminary injunctive relief, including the erection of a fence, the removal of containers and chemical residues and the investigation of, and submission to the court of a report on, conditions in the affected area).

The defendants may rest assured that this court does not view section 7003 as a general "clean–up statute"[29] and that, if any injunction is issued thereunder, it will be carefully tailored to the need for remedial action which is ultimately established at trial. "As with any equity case, the nature of the violation determines the scope of the remedy," *Swann v. Charlotte–Mecklenburg Board of Education,* 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971); any remedy ordered by this court will be "commensurate with the violation ascertained." *Columbus Board of Education v. Penick,* 443 U.S. 449, 465, 99 S.Ct. 2941, 2950, 61 L.Ed.2d 666 (1979).

Only proof of a health or environmental emergency for which the defendants are responsible would justify some of the relief sought by the United States in this action. *See* Oversight Report, *supra,* at 32 (section 7003's "'imminent and substantial' test carries a high burden of proof in court"). Indeed, even if such an emergency were proved, the court might, in the exercise of its equitable powers, decline to grant part of the relief requested by the government. However, the court cannot hold as a matter of law that section 7003 does not authorize the type of injunctive relief sought here, and it would be inappropriate to strike any part of the Prayer for Relief before the plaintiff has had an opportunity to make its case.[30] The defendants' motions to strike are therefore denied.

---

**29.** Brief of Solvents Recovery, p. 48. As the defendants point out, situations which do not present true emergencies are better dealt with through the more comprehensive, if more cumbersome, provisions of RCRA and the EPA regulations promulgated thereunder than in an action under section 7003. *See, e. g.,* 42 U.S.C. §§ 6922–25, 6928.

**30.** The defendants' argument that portions of the Prayer for Relief should be stricken on the ground that granting such relief would retroactively penalize them for pre–RCRA conduct must fail, for the reasons stated at pp. 1141–42 *supra.*

*Conclusion*

The defendants' motions to dismiss Claim One of the complaint or, in the alternative, to strike certain paragraphs of the Prayer for Relief are denied, for the reasons stated above. The parties shall proceed to bring this matter to trial as expeditiously as possible.

It is so ordered.